INHABITANTS OF ST. GEORGE *vs.* CITY OF BIDDEFORD.

Knox. Opinion January 2, 1885.

*Paupers. Insanity. Marriage. Evidence. Expert.*

The law recognizes all the grades and varieties of mental imbecility under the general head of insanity, without troubling itself much about classifications or exact definitions. In a legal sense, mental unsoundness is insanity, and mental soundness is sanity.

In questions involving insanity, the law applies different rules and tests according to circumstances; it tries to ascertain whether a person, alleged insane, is such in respect to the particular matter which is being investigated.

A marriage is void, if, at the time it took place, the husband had not sufficient mental capacity to enable him to understand the nature of the marriage contract and of the marital relation, and to understand that he took upon himself the duties, obligations and responsibilities of that relation. The

rule of competency would not require that he should understand all the marital duties and obligations, but requires that he should understand that he assumes them whatever they may be.

It is not erroneous to rule to a jury, as a further illustration of the test of competency, that a man would be considered incompetent to make the marriage contract, if he had not mental capacity enough to be able to provide a support for a family, when he is possessed of means sufficient for the purpose.

Upon the question of the insanity of a person, the entire conduct of the individual through life may be taken into account, in order to judge how far it betokens mental deficiency.

It is not erroneous for a judge to allow an expert to testify to his opinion that an alleged imbecile was not capable of understanding his duties towards his wife arising out of the matrimonial union, the issue being whether such imbecile had mental capacity sufficient to render his marriage a valid act.

ON EXCEPTIONS and motion to set aside the verdict.

Assumpsit for pauper supplies furnished to Elizabeth Montgomery, whose maiden name was Elizabeth Waterhouse, and her three children. It was admitted that the settlement of the mother was in Biddeford, unless it was changed by her marriage with John Montgomery, whose settlement was admitted to be in St. George.

The plaintiffs contended that, at the time of his alleged marriage, John Montgomery was not of sound mind and because of that did not have the legal capacity to contract marriage.

The jury rendered a verdict for the plaintiffs for four hundred and eighty-six dollars and found specially that John Montgomery at the time of his marriage with Elizabeth Waterhouse did not have capacity to contract such marriage.

The defendant moved to set the verdict aside, and alleged exceptions to certain of the rulings and instructions of the presiding justice, which are sufficiently stated in the opinion.

*A. P. Gould*, for the plaintiffs, cited: 2 Kent's Com. 76; *Atkinson* v. *Medford*, 46 Maine, 510; *Middleborough* v. *Rochester*, 12 Mass. 363; *Anonymous*, 4 Pick. 32; 1 Bish. Mar. & Div. (4th ed.) § 127 and cases, and § 134; 1 Black. Com. 438; Ray's Med. Jur. of Insanity, § § 85, 86, 87; *Portsmouth* v. *Portsmouth*, 1 Haggard, 355; *Strong* v. *Farmington*, 74 Maine, 46; *Farmington* v. *Somersworth*, 44 N. H. 589; 2

Greenl. Ev. § 464; *Wightman* v. *Wightman*, 4 Johns. Ch.. 347; *Sullivan* v. *Sullivan*, 2 Haggard, 238.

*R. P. Tapley*, for the defendant, cited: Schouler, Dom. Rel.. § § 14, 18; 4 Pick. 22; 11 Wheat. 103; 10 R. I. 165; 47 Iowa, 121; Bishop, Mar. & Div. § § 69, 177; *Ward* v.. *Dulaney*, 23 Miss. 410; *Hovey* v. *Chase*, 52 Maine, 317;. *Moffitt* v. *Witherspoon*, 10 Iredell, 185.

PETERS, C. J. R. S., c. 59, § 2, provides, that no insane person or idiot shall be considered capable of contracting mar-- riage. It has been recently decided in this state that it may be; proved in any collateral proceeding, where the question legiti-- mately arises, that a marriage is void because of the insanity of one of the parties thereto. *Unity* v. *Belgrade, ante*, 419. The defendants contend that, while this rule applies in cases of. insanity or idiocy, as those terms were primarily understood, it does not apply to a case of mere weakness or unsoundness of mind.

The statute of construction and interpretation, R. S., c. 1, § 6, div. 8, declares that the words " insane person " may include an idiotic, *non-compos*, lunatic, or distracted person. But, if there were no statutory guide in the matter, the rule would be the same. The old idea of but two sorts of mental derange-- ment, idiocy and lunacy, has long been repudiated. It is now about universally considered that there are many degrees and varieties of mental derangement which come under the generic head of insanity. The law does not trouble itself much about classifications and exact definitions, but contents itself with a. practical and general view. Insanity, in a legal sense, embraces. all the groups and conditions. It is said in 1 Beck's Med. Jur.. 12th ed. p. 744: " The division of insanity into numerous varieties, though convenient for purposes of description, and also, to a certain extent, in accordance with nature, is still most arbitrary and theoretical. The law does not recognize these divisions." It is said in Bou. Law Dic. Title, Imbecility, "The various grades of imbecility, however interesting in a philoso-

iphical point of view, are not very closely considered by courts." In a legal sense, unsoundness of mind is synonymous with insanity. Upon questions of insanity the law attempts to ascertain whether a party is or not possessed of such soundness of mind as renders him competent to do, or relieves him from the responsibility for doing, certain acts. In a legal and general sense, mental soundness is sanity — mental unsoundness is insanity.

The trouble is to define mental unsoundness or insanity. Prof. Maudsley, in "Responsibility in Mental Disease" says: "It would certainly be vastly convenient, and would save a world of trouble, if it were possible to draw a hard and fast line, and to declare that all persons who were on one side of it must be sane and all persons on the other side of it must be insane. But a very little consideration will show how vain it is to attempt to make such a division. That nature makes no. leaps, but passes from one complexion to its opposite by graduations so gentle that one shades imperceptibly into the other, and no one can fix positively the point of transition, is a sufficiently trite observation." All writers concur upon this point.

To avoid this difficulty as far as is practicably possible, and in accordance with a common sense view of the matter, the law applies different rules or tests under different circumstances. It tries to ascertain whether a person, alleged insane, is such in respect to the particular question which is being investigated. A man may be of unsound mind in one respect, and not in all respects. He may have mental competency to make one contract and not another. And an insane man may make certain contracts beneficial to himself.

The question, therefore, in the case at bar, was whether the alleged imbecile had mental capacity enough to make the contract of marriage. Had he mental soundness sufficient to make that kind of contract? Although marriage be "a status," or "a relation," or "an institution," it requires the intelligent consent of two persons to make the contract that produces it.

The judge prescribed this rule for the jury: The marriage was void if, at the time it was contracted and solemnized, John

had not sufficient mental capacity to understand the nature of the marriage contract, and that by it he became the husband of Elizabeth and assumed all the duties, obligations and responsibilities and all the rights growing out of the relation. He need not have understood all the duties, obligations and responsibilities which the marriage relation imposed upon him, because that rule would probably render void many marriages in this state. . . But he should have had at the time sufficient mental capacity to enable him to understand the nature of the marriage relation, the nature of the marriage contract, and to understand that upon himself he took with it all the duties, obligations and responsibilities which the law would impose upon him as a result of that contract on his part, whatever they were. We have omitted a few paragraphs of the charge on this point, for brevity's sake, not in the least thereby altering the sense. So far, we do not understand that any objection is urged to the rule given.

One of the parties requested an illustration or amplification of the rule thus given, in response to which this further instruction was given to the jury : "The husband was incapable of contracting a valid marriage if from mental imbecility he was incompetent to contract for 'and provide' the ordinary means of support for his wife, himself and family. And here it is proper I should remark to you again that I do not mean that he should have had the financial ability to provide for the support of his wife, himself and family, because a man having no property, no financial ability to any degree, still if he has mental capacity may contract marriage and it will be a valid contract, but what I intend to say is that if he had not from mental imbecility capacity to make the ordinary contract which would be required from time to time to provide for the support of his wife, himself and his family, whatever it might be, then he has not sufficient capacity to enter into the contract."

The defendants think it erroneous to say that the husband should be required to have the capacity "to provide" for the family. But the judge made it clear that he did not mean that the husband must necessarily succeed in earning a livelihood. The idea was that, if the husband had means of his own or means

furnished by others, he should have capacity enough, thus situated, to contract for and provide some kind of an ordinary support for his family. If the husband did not have mind enough to know that it was necessary to have shelter, food and raiment, and capacity enough to procure them, when a want of means did not prevent, he must be an imbecile indeed. A much quoted rule in the case of *Browning* v. *Reane*, 2 Phillim. 70, was this : " If the incapacity be such that the party is incapable of understanding the nature of the contract itself, and incapable, *from mental imbecility*, of taking care of his or her own person or property, such an individual cannot dispose of his or her person and property by the matrimonial contract, any more than by any other contract."

Nor is the charge amenable to the criticism, made upon it, that the party was required to have common capacity to make contracts generally. The judge, in a part of the charge not quoted by us, merely by way of illustrating and enforcing the theory presented, substantially said that the same rule would apply to this man making this contract of marriage, that would apply to other men making other contracts. That was not erroneous.

Objection is made that testimony as to the condition and conduct of the husband years before and years after the marriage, was allowed to be introduced. It was all admissible in a case of this kind. The law in many cases allows the search to extend back even to the ancestors of the person under inquisition, to see what their mental predisposition may have been. Professor Maudsley says, "Each case must be considered on its merits, the entire conduct of the individual through life being taken into account, in order to judge how far it betokens mental deficiency."

Dr. Levensaler was allowed to testify that the alleged imbecile was not capable of understanding his duties towards his wife arising out of the matrimonial union. The doctor was permitted to testify, not merely because he was a doctor, but because an expert. It was within the discretion of the presiding judge to allow the question. The question answered merely in the negative might not carry any very definite idea to the minds of

the jury, but cross examination should regulate it. A good deal of discretion must be allowed to a trial judge in such matters.

We do not think we can fairly disturb the verdict, upon the motion for a new trial. The case was an uncertain one, and not without strong points upon either side.

*Motion and exceptions overruled.*

WALTON, VIRGIN, LIBBEY, EMERY and HASKELL, JJ., concurred.