William B. KNIGHT, as Special Guardian of William Austin Knight, and William Austin Knight, his ward

v.

Jean T. RADOMSKI, also known as Jean T. Knight.

Supreme Judicial Court of Maine.

May 30, 1980.

Gross, Minsky, Mogul & Singal, P.A., George Z. Singal (orally), Elizabeth A.

Ebitz, Bangor, Fenton, Griffin, Chapman, Smith & Fenton, Douglas B. Chapman, Bar Harbor, for plaintiff.

Berman, Berman & Simmons, P.A., William Robitzek (orally), Jack H. Simmons, Lewiston, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY and GLASSMAN, JJ.

GODFREY, Justice.

William B. Knight, father and guardian of William Austin Knight (known as "Buzz"), brought this action, as special guardian, to annul the marriage of Buzz to defendant Jean T. Radomski. The action was brought in Superior Court on behalf of Buzz pursuant to 19 M.R.S.A. § 632 (Supp. 1979–80)[1] on essentially three grounds: first, that Buzz Knight had been declared mentally incompetent before the marriage and his duly appointed guardian had had no notice of the marriage and had not consented to it; second, the marriage license had been procured by fraudulent or improper procedure; and third, on the date of the marriage, defendant had not completed a valid divorce from her previous husband.[2] After a trial without jury, the Superior Court denied the requested annulment and dismissed the complaint. Knight, Sr. filed this timely appeal. Radomski filed a cross-appeal, which has since been abandoned. We sustain the plaintiff's appeal and reverse the judgment of the Superior Court.

From the voluminous record on appeal, we conclude that the following facts are undisputed: On October, 1972, Buzz Knight was struck by an automobile while jogging and suffered severe brain damage with paralysis and change of personality. He was eventually sent to the Veterans Administration Hospital at Togus for treatment. In March, 1973, William B. Knight was appointed conservator of his son's estate pursuant to 18 M.R.S.A. § 3701 (1964).[3] In October, 1973, Buzz was divorced from the woman to whom he had been married before the accident.

Early in 1977 the defendant, Dr. Jean Radomski, a psychologist at Togus, began working with Buzz Knight as a patient. Dr. Radomski, who was married at the time, became romantically attracted to Buzz and in March, 1977, asked his parents if they would object to her marrying him. After the senior Knight stated his reservations about her proposal, she still continued to work with Buzz as a patient.

On September 12, 1977, William B. Knight filed a petition for guardianship of Buzz. On the basis of considerable medical testimony, the probate judge of Hancock County, acting pursuant to 18 M.R.S.A. ch. 501, subch. III (1964 and Supp. 1979–80), issued a decree on January 17, 1978, imposing a guardianship on Buzz Knight and appointing William B. Knight guardian of his estate and temporary guardian of his person for a period of sixty days. Jean Radomski appeared at the probate court hearing in opposition to the appointment of Knight, Sr., as guardian. On March 21, 1978, the probate court issued an order appointing William B. Knight permanent guardian of the person of Buzz Knight, conditioned on the filing of a bond.

Defendant stopped treating Buzz as a patient on September 12, 1977, the same day that Mr. Knight filed the petition for guardianship. She had been served on September 2, 1977, with a complaint by her husband, Theodore Radomski, for a Maine divorce. Her husband left Maine in the same month and became a resident of Arizona, where he again filed for divorce. In October, defendant left Maine and became a resident of Colorado.

Sometime in March, 1978, Theodore Radomski went to the Dominican Republic to

---

1. 19 M.R.S.A. § 632 provides, in part, as follows:

When the validity of a marriage is doubted, either party may file a complaint as for divorce, and the court shall order it annulled or affirmed according to the proof  .  .  .  ..

2. 19 M.R.S.A. § 33 (1964) provides as follows:
Marriages, contracted while either of the parties has a former wife or husband not divorced, living, are void.

3. This section has since been repealed, effective January 1, 1981. P.L. 1979, ch. 540, § 24–C.

obtain a quick divorce. Defendant had signed a power of attorney allowing her husband's Dominican attorney to appear for her in her absence. On March 28, the day after he obtained the Dominican divorce, Theodore Radomski delivered the decree to defendant in Boston.

On the same day, March 28, 1978, the probate judge approved the bond filed by William B. Knight pursuant to the guardianship order of March 21. The judge issued a formal letter of appointment of Knight as permanent guardian, and his order was docketed before noon on March 28.

At 1:30 p. m. on the same day, a marriage ceremony took place between Buzz Knight and defendant Radomski at the Togus Hospital. The ceremony was witnessed by two of defendant's expatients. Also dated March 28, 1978, is an order of the probate judge of Kennebec County granting a waiver of the five-day waiting period on the ground that Jean Radomski had patients waiting in Colorado. The couple immediately left the hospital and went to Connecticut and then to Colorado the next day. Buzz Knight was later returned to Togus Hospital, where he remains pending the outcome of this litigation.

At trial, the presiding justice listened to much testimony from witnesses on both sides concerning Buzz Knight's competence, mental and emotional condition, comprehension of the marital relationship, and tractability. Buzz himself did not testify. The justice began the opinion accompany-

ing his order by stating that he drew no inference from the failure of Buzz to testify and that he found the evidence conflicting as to whether Buzz himself desired an annulment. He stated, also, that the expert witnesses were in disagreement about whether Buzz suffered from psychosis. He concluded that the plaintiff guardian, William B. Knight, had failed to meet his burden of showing that Buzz "lacked sufficient mental capacity at the time of the marriage." He found that it was "more probable than not that on March 28, 1978, William Austin Knight had sufficient mental capacity to understand the nature of the marriage contract and the duties and responsibilities thereby created."

■ The case presents a threshold issue because of the provision of 19 M.R.S.A. § 632 (Supp. 1979–80) that "either party" to a marriage may file a complaint for annulment when the validity of a marriage is doubted. In *Inhabitants of Winslow v. Inhabitants of Troy*, 97 Me. 130, 132, 53 A. 1008, 1009 (1902), this Court stated that a guardian "only" could not bring an annulment action, but the Court declined to say whether a guardian could bring such an action on behalf of his incompetent ward.[4] We hold now that a guardian of an incompetent has standing to bring an annulment action under section 632 on behalf of the ward. Such standing is inherent in the guardian's responsibility for protecting the rights of the ward under 18 M.R.S.A. ch. 501, subch. III (1964 & Supp. 1979–80).[5]

4. The annulment statute in *Troy* was virtually the same as the present 19 M.R.S.A. § 632, *supra* note 1.

5. Title 18 M.R.S.A. has been repealed in its entirety by P. L. 1979, ch. 540, § 24–C, effective January 1, 1981, and replaced by P.L. 1979, ch. 540, § 1, the Maine Probate Code, title 18–A of the Revised Statutes. Under section 8–401(b)(3) of the new Code, a guardian of an incompetent person will continue to hold the appointment after January 1, 1981, but the powers and duties of the appointment will be governed by the new Code.

Guardianship of incapacitated persons will be governed by article V, parts 3 and 4, of the new Code. 18–A M.R.S.A. § 5–303 provides the procedure for appointment of a guardian, and § 5–312 defines a guardian's general pow-

ers and duties. Subsection (a) of section 5–312 provides, in part:

A guardian of an incapacitated person has the same powers, rights and duties respecting his ward that a parent has respecting his unemancipated minor child . . . .

Under subdivision (1) of subsection (a),

To the extent that it is consistent with the terms of any order by a court of competent jurisdiction . . . he [the guardian] is entitled to custody of the person of his ward . . . .

Marriage of minor persons is governed by 19 M.R.S.A. § 62 (Supp. 1979–80), which provides that a marriage certificate shall not be issued to

With respect to the merits, Knight, Sr., relies on several provisions of 18 M.R.S.A. ch. 501, subch. III. Section 3601(1) (1964 & Supp. 1979–80) provides that guardians may be appointed for

all persons, including those mentally ill or of unsound mind . . . who, by reason of infirmity or mental incapacity, are incompetent to manage their own estates or to protect their rights.

Section 3603 provides:

When such application [for appointment of a guardian] is made and notice issued thereon by the judge, the applicants may cause a copy of their application and the order of the court thereon to be filed in the registry of deeds for the county. If a guardian is appointed thereupon, all contracts, except for necessaries, and all gifts, sales or transfers of real or personal estate made by such person after said filing and before the termination of the guardianship are void. This section does not add anything to the validity of any such act previous to said filing.

Section 3605 provides, in part:

Such guardians shall have the custody of the persons of their wards, if resident in the State, except so far as the court of probate may from time to time otherwise order. . . .

Section 3607 provides:

When a person over 18 years of age is under guardianship, he is incapable of disposing of his property otherwise than by his last will or of making any contract, notwithstanding the death, resignation or removal of the guardian. When, on application of any such person or otherwise, the judge finds that a guardian is no longer necessary, he shall order the remaining property of the ward to be restored to him, except a legal compensation to the guardian for his services.

In addition to the quoted provisions from title 18, Knight, Sr., relies on 19 M.R.S.A.

§ 32 (1964), which provides: "No mentally ill or feeble-minded person or idiot is capable of contracting marriage." Marriages prohibited by section 32, if solemnized in Maine, are declared "absolutely void" by 19 M.R.S.A. § 631 (Supp. 1979–80).

The Superior Court rejected Knight's arguments. It held that marriage is not a contract of the sort prohibited by the quoted provisions of title 18. In so ruling, the court relied on *Roether v. Roether*, 180 Wis. 24, 191 N.W. 576, 28 A.L.R. 631 (1923), in which the Wisconsin court held, in an action by a wife to affirm her marriage to an alleged incompetent, that marriage is not a "contract" within the meaning of a statute resembling 18 M.R.S.A. § 3603. The Superior Court conducted its own inquiry into Buzz Knight's competence to marry at the time of the marriage, holding that the probate court's prior appointment of a permanent guardian of his person, finalized on the day of the marriage, was not controlling because the competence requisite for marriage is different from that required for other matters.

The Superior Court relied on *Inhabitants of St. George v. City of Biddeford*, 76 Me. 593 (1885), which involved a collateral attack on the validity of a marriage of an allegedly insane person. However, *St. George* was not a case where another court had already made an adjudication of incompetence and appointed a guardian of the person of the adjudicated incompetent. In *St. George*, the judge submitted to a jury the question of the man's competence to marry, instructing the jury that the man need not have understood all the duties, obligations and responsibilities which the marriage relation imposed upon him but "should have had at the time sufficient mental capacity to enable him to understand the nature of the marriage relation, the nature of the marriage contract, and to understand that upon himself he took with it all the duties, obligations and responsibil-

a minor without the written consent of the parent guardian or person having custody by court order.

Parts 3 and 4 of article 5 of the new Probate Code provide procedures for protecting the

property of a person under disability. There is, however, no provision using the language of the present title 18, sections 3603 and 3607.

ities which the law would impose upon him as a result of that contract on his part, whatever they were". 76 Me. at 597. This Court approved the judge's instructions and stated that a person "may have mental competency to make one contract and not another". 76 Me. at 596.[6] Cases in other states are generally in accord. *See* Annots., "Mental Capacity to Marry", 28 A.L.R. 635, 644 (1924); 82 A.L.R.2d 1040, 1046 (1962).

■ As a general rule, a party attacking the validity of a marriage on the ground of mental incapacity bears the burden of proof. *E.g., Inhabitants of Winslow v. Inhabitants of Troy, supra; Johnson v. Johnson*, N.D., 104 N.W.2d 8 (1960). See Annots., 28 A.L.R. 635, 652 (1924); 82 A.L.R.2d 1040, 1053 (1962). In the present case, the Superior Court found that "it is more probable than not" that Buzz Knight had "sufficient mental capacity to understand the nature of his marriage contract", which would imply, in effect, that even if the burden were on the defendant, she had met it. If this case did not involve a guardianship, we would necessarily review the Superior Court's decision under a clearly-erroneous standard. However, we do not reach any question of the sufficiency of the evidence to support the court's finding of fact because we disagree with the court's ruling that 18 M.R.S.A. §§ 3603 and 3607 do not apply to marriage contracts.

Nothing in the provisions of sections 3603 and 3607 considered in the entire context of subchapter III of 18 M.R.S.A. ch. 501, suggests that exceptions should be made for any particular kind of contract, especially in view of the express exception for "necessaries" appearing in section 3603 itself. On the contrary, section 3607 states unequivocally that a person under guardianship shall be legally "incapable . . . of making any contract." Against this statutory language, we could uphold the decision of the Superior Court only by holding that marriage is not really a "contract" in any sense that could have been intended by sections 3603 and 3607.

The law of Maine has always regarded marriage as a civil contract. Ninety-five years ago, in *Inhabitants of St. George v. City of Biddeford, supra,* this court described the marriage contract as follows: "Although marriage be 'a status' or 'a relation' or 'an institution', it requires the intelligent consent of two persons to make the contract that produces it." 76 Me. at 596. *See also Dolan v. Dolan,* Me., 259 A.2d 32, 52 A.L. R.3d 577 (1969). Legislation relating to domestic relations, contained in title 19 of the Revised Statutes, is replete with references to the concept of "contracting marriage". In particular, 19 M.R.S.A. § 32 (1964) provides that no mentally ill or feeble-minded person or idiot is "capable of contracting marriage".

■ It is true that section 32 does not mention incompetents under guardianship and arguably would not apply to an adjudicated incompetent who did not qualify as "mentally ill" or "feeble-minded" or idiotic. But we cannot infer from that omission an intent in 18 M.R.S.A. §§ 3603 and 3607 to create an exception to the contractual disability of an adjudicated incompetent under guardianship. Instead, it is necessary to conclude that the Maine statutes treat marriage as arising out of contract and that if it had been the purpose of the legislation to except contracts of marriage from the disability of an adjudicated incompetent under guardianship, it would have made explicit provision to that effect. In the absence of explicit language, we decline to read such an exception into the guardianship statute.

It should be emphasized that William B. Knight had been appointed guardian of the person as well as the property of Buzz Knight. The responsibilities of a guardian of the person include the full spectrum of responsibilities necessary to provide for the care and overall well-being of the ward, subject to the general superintendency of the court. Because the marriage of a ward can have great impact on matters for which

---

6. R.S. 1884, ch. 59, § 2 provided that "no insane person or idiot shall be considered capable of contracting marriage."

the guardian of his person is responsible under our statutes, it would be inconsistent with the protective purposes of the relevant Maine legislation to permit an incompetent ward to enter effectively a contract of marriage that is not approved by the duly appointed guardian of his person.

In *Roether v. Roether, supra*, the Wisconsin Supreme Court held that although marriage is a civil contract, "its essence is to define a status in society, rather than to regulate control over property," whereas in the guardianship statute, "the legislature was dealing with the latter subject". 180 Wis. at 27, 191 N.W. at 577. The Maine statutory context is different: The role of the guardian of the person of an incompetent person is not limited in Maine to protection of his property, nor is the marriage of an incompetent ward without effect on his property interests. In Maine, in the absence of effective agreement to the contrary, marriage has obvious effects on a person's property interests. The fact that the controlling statutes manifest, among other purposes, the purpose of protecting the property of an adjudicated incompetent under guardianship actually tends to support the conclusion that the contractual disability in terms set forth in the guardianship statute does include marriage.

In conclusion, the legislation governing this case, 18 M.R.S.A ch. 501, subch. III, requires us to hold that the marriage of Jean Radomski and Buzz Knight, without the consent of the duly appointed guardian of the person of Buzz, should have been annulled. Under that legislation, the probate court of Hancock County retains continuing jurisdiction over the guardianship of Buzz Knight. Having already duly adjudicated Buzz to be incompetent and placed him under formal guardianship, that court remained the proper forum for determination of issues relating to his welfare. It is clear from the record in this case that marriage could cause profound changes in the ward's life. Disputes over the extent and desirability of those changes should be resolved by the court superintending the guardianship. That court has authority under 18 M.R.S.A. § 3605, in appropriate circumstances, to modify the terms of the guardianship, and its decisions in that regard are reviewable by the Superior Court sitting as the Supreme Court of Probate. 4 M.R.S.A. § 401 (1979).[8]

Defendant's proper procedure, if she could not obtain the guardian's consent, would have been to seek relief from the Hancock County probate court by filing a motion stating grounds for modification of the guardianship order to permit her marriage with Buzz. In no other way can the integrity of the legislative arrangements for guardianship established by 18 M.R.S.A. ch. 501, subch. III, be maintained.

In view of our disposition of the case, it becomes unnecessary to consider the effect of the fact that the probate judge of Kennebec County, who granted a waiver of the statutory waiting period for marriage required by 19 M.R.S.A. § 61, had not been informed when he did so that Buzz Knight was under guardianship as an incompetent by order of the Hancock County probate court. It also becomes unnecessary for us to pass on the validity of the Radomskis' Dominican divorce. We intimate no opinion on those questions.

The entry is:

Appeal sustained.

Judgment reversed.

Remanded for entry of judgment for plaintiff annulling the marriage.

Cross-appeal dismissed.

7. Repealed, effective January 1, 1981, by P.L.1979, ch. 540, § 7–B.